# UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| McCLATCHY NEWSPAPERS, INC., doing business as THE FRESNO BEE,<br><br>Plaintiff,<br><br>v.<br><br>CONTINENTAL CASUALTY COMPANY, and DOES 1 through 25, inclusive<br><br>Defendants. | 1:14-CV-00230-LJO-SAB<br><br>**ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**  (Doc. 16) |

## I. INTRODUCTION

McClatchy Newspapers, Inc., doing business as the Fresno Bee ("Plaintiff" or the "Insured") brought an action against Continental Casualty Company ( "CNA Insurance") and Does 1 through 25 (collectively, "Defendants"), the provider of Plaintiff's excess workers' compensation insurance. On June 28, 2012, Defendants requested reimbursement of a previously made payment and rejected any future claim based on losses stemming from Plaintiff's employee, Michael Book's ("Book"), workers' compensation claim. On February 24, 2015, Defendants brought a motion for summary judgment on all claims. *Motion for Summary Judgment*, Doc. 16. The motion was set for hearing March 20, 2015, but the hearing was vacated and the matter submitted for decision on the papers pursuant to Local Rule 230(g). Doc. 32.

## II. FACTUAL BACKGROUND[1]

On February 10, 1998, Defendants issued Plaintiff a three-year insurance policy providing Plaintiff coverage against workers' compensation claims submitted in California that exceeded Plaintiff's specific retention of $300,000 per occurrence. *Specific Excess Workers Compensation Policy Continental Casualty Company*, Doc. 1-1 at 2 (the "Policy"). Plaintiff's insurance policy states:

> No indemnity shall be afforded under this Policy, unless and until the Insured shall have sustained loss and claim expense as a result of each occurrence in excess of the amount of the Retention stated in Item 5 for the types of coverage involved in the Declarations. The Company hereby agrees to indemnify the Insured against loss and claim expense as a result of each occurrence in excess of such Retention, subject to the Limit of Indemnity provided for in Item 4 for the types of coverage involved in the Declarations.

*Id*. at 8. The Policy states that "occurrence" as "applied to bodily injury shall mean accident," and that "[o]ccupational disease sustained by each employee shall be deemed to be one separate occurrence." *Id*. at 15. It defines "occupational disease" to "include (1) death resulting therefrom and (2) cumulative injuries." *Id*. The Policy requires the Insured to promptly forward the underwriters any information it may request on the individual occurrence. *Id*. at 16. Defendants reserve "at [their] own election and expense and in addition to any indemnity for claim expenses provided by [the] Policy… the right but not the duty to participate with the Insured in the investigation, settlement, defense or appeal of any claim, suit or proceeding which might involve liability of the [Defendant]." *Id*.

On December 27, 1999, Book injured his neck while lifting a newsstand. *Id*. The record indicates that Book continued to work after the incident, possibly with some limited responsibilities, until May 2000. *Dr. Jeffrey Lundeen's Defense Qualified Medical Examination*, Doc. 19-1 Ex. A at 7. Book saw several doctors regarding his injury, starting with his personal physician, whom Book saw a few days after the accident. *Id*. at 2. In addition to prescribing a muscle relaxant, Book's personal physician recommended Book see the doctor who worked for the Fresno Bee, Dr. Glenn Fujihara. *Id* at 9. Book

---

[1] Because on summary judgment the evidence of the non-moving party is assumed to be true and disputed facts are construed in the non-movant's favor, the Court sets forth the undisputed facts and notes those disagreements of fact that are relevant to this decision.

saw Dr. Fujihara on January 19, 2000, at which point Book reported that he had been experiencing pain in his neck, upper back, right shoulder and arm pain for approximately two months. *Transcription*, Doc. 19-1 Ex. C at 20. Dr. Fujihara's report stated that Book had been lifting bundles of papers as part of his responsibilities in the circulation department for 14 years. Book reported to Dr. Fujihara that the pain increased two weeks prior when he was lifting a newsstand and that he had not previously been injured. *Id*. Dr. Fujihara determined that the "cervical and thoracic back and right shoulder strain that appear to be a cumulative trauma disorder with acute exacerbations at work." *Id*. at 21. Dr. Fujihara determined that Book should be seen again in a few weeks. *Id*. The report from the return visit was not provided to the Court.

Book was seen by Dr. Alan Jakubowski for an electrodiagnostic evaluation on March 8, 2000, where Book reported that the incident in December 1999 was a "give away" of his right arm and had left him weak on that side. Doc. 23-3 at 3. Dr. Jakubowski found "evidence of C6 cervical radiculopathy into the right UE that is severe." *Id*. He also noted "wasting… in the right biceps and brachioradialis muscles" but no evidence of C5 or C7 radiculopathy." *Id*.

On April 13, 2000, Book was seen by Dr. Brian Clague at the Neurosurgical Associates Medical Group, Inc. Doc. 19-1Ex. D at 24-27. Book told Dr. Clague that he had had neck pain for many years but that in October of 1999 he developed some weakness with writing. Book also attributed the pain to the incident with the newsstand in December 1999. *Id*. Dr. Clague believed that Book had "cervical stenosis secondary to degenerative changes, probably on the basis of cumulative trauma. It clearly triggered though an increase in symptoms with his lifting episode while at work. He now is progressing with regard to the extent of disability and I think it is due to foraminal narrowing and multiple root impingement." *Id*. at 27. .

On May 12, 2000, Book had surgery that consisted of a cervical laminoplasty at C-4-5-6 with a foraminotomy at C4 through C6 on the right side with iliac crest bone graft and Synthes plate. Doc. 23-2 at 95. In the preoperative history and physical, Dr. Clague noted "it was felt that

[Book] had cumulative trauma and a muscle strain." *Id*. at 96. .Book reported to Dr. Clague that "back as far as October of last year with writing, he had right shoulder and arm ache. The right arm tended to tremble when he did his routes." *Id*. Dr. Clague also noted that Book's condition continued to deteriorate quickly after the incident on December 27, 1999. *Id*.

After his initial surgery, Book continued to have pain in his neck and shoulder as well as limited mobility that required continued doctors' care as well as physical therapy. Doc. 23-2 at 30-40. During a physical, Book stated that even after approximately six months of physical therapy he did not feel improvement. Doc. 23-3 at 42. Due to the continued pain, Book received three or four foraminal steroid injections. *Id*. at 43. As the injections only provided temporary relief, Book was advised by three doctors to have a second surgery. In advance of the second surgery, Book was evaluated by orthopedic surgeon Dr. Timothy Watson on August 16, 2001. Doc. 23-2 at 25. Dr. Watson reported Book's "problem goes back to December, 1999 when he had an on the job injury which resulted in right arm weakness and pain in the shoulder and arm." *Id*.

Book had a second surgery on October 23, 2001. Doc. 23-2 at 12. The surgery consisted of "anterior cervical discectomies at C4 through C7 levels with fusion and allograft bone grafting with Synthes plating and a halo placement." Doc. 19-1 at 5. Book was required to wear the halo for three months, and received physical therapy for a year after surgery. *Id*.

As of December 14, 2001, Plaintiff informed Defendants' appointed underwriters, Wexford Underwriting Managers, Inc., of a potential claim based on Book's injury. Doc. 23-2 at 3. In response, the underwriters requested all of Book's "medical and investigative reports as well as any other pertinent information to enable us to properly evaluate [the] claim." *Id*. This information was subsequently provided. *Id*.

On July 18, 2002, Book filed an application for adjudication of claims with the Workers' Compensation Appeals Board. *Michael Book v. The Fresno Bee, PSI Claims Management Adjusting*,

4

Nos. FRE209512, FRE174920, Doc 19-1 Ex. F at 28. As part of Book's workers' compensation claim, he obtained a Medical Legal Evaluation Involving Extraordinary Circumstances from Dr. Jeffrey Lundeen. Dr. Lundeen determined that Book's injury was the "result of cumulative trauma and the result of this specific injury involved in this claim. [The] period of cumulative trauma would include this patient's 15 years with working for the Fresno Bee." Doc. 19-1 at 11. Dr. Lundeen attributed forty percent of Book's injury to cumulative trauma and sixty percent to the specific injury that occurred on December 27, 1999. *Id.* at 12. As part of Book's workers' compensation claim, he underwent a functional capacity evaluation on May 22, 2003, which determined that he was not physically capable of returning to work on either a part time or full time basis. Doc. 23-3 at 44. On July 21, 2004, Plaintiff received authority to settle Book's workers' compensation case from Defendants. Doc. 21 at 12. Book's case ultimately settled on October 13, 2004, with a stipulation that he had ninety percent permanent disability that entitled him to two hundred and thirty dollars per week and his life pension. *Joint Stipulations with Request for Award*, Doc. 19-1 Ex. G at 29. The settlement stipulated: "Settlement based on Parties' ratings of Defense … Lundeen (report dated 11/11/03) at 65% and treating physician Zucherman (last report dated 8/15/03) with consideration for Defendants' avoidance to potential exposure at 100 percent should matter proceed to trial." Doc. 1-3 at 3. Defendants' underwriters approved of the settlement of ninety percent disability. Doc. 23-3 at 30.

In compliance with the Policy, Plaintiff informed its insurance underwriter of the status of the claim. *Letter to Wexford Underwriting,* Doc.23-3 at 25. Plaintiff initially submitted a request for reimbursement on October 9, 2009. Plaintiff submitted a second request on January 13, 2011, for $13,477.07. *Letter to CNA Insurance*, Doc. 23-3 at 63. On April 25, 2011, Defendants made a payment to Plaintiff for the full amount of the reimbursement request. Doc. 23-3 at 108. On June 28, 2012, Defendants sent Plaintiff a letter requesting the "refund of the prior reimbursement" due to Defendant's assertion that Book's injuries and subsequent disability were not due to a single occurrence but rather two: a cumulative injury as well as a specific trauma. *Letter to The McClatchy Company*, Doc. 1-5.at 3.

5

### III. PROCEDURAL HISTORY

On February 21, 2014, Plaintiff filed a complaint against Defendants alleging breach of contract for demanding a refund on the previously paid reimbursement and bad faith for: (1) failing to fully investigate Plaintiff's claim, (2) applying an unduly restrictive interpretation of its policy terms for the purpose of denying coverage, (3) selectively choosing to rely on a single medical report, (4) disregarding the workers' compensation judgment, (5) demanding reimbursement of indemnity payments previously made, (6) characterizing a denial letter as a reservation of rights letter, (7) subjecting payment to conditions and terms not included in the policy, (8) forcing Plaintiff to institution this litigation, and (9) failing to give Plaintiff equal consideration as Defendants. Doc. 1. Defendants answered the complaint, asserting that Book's injury was a result of two occurrences, as defined by the insurance policy. Defendants further asserted that, [w]hen split into two occurrences, neither of Plaintiff's claims reached the $300,000 threshold, and, therefore, that Defendants were not liable for breach of contract or bad faith. Doc. 8 at 5. Defendants asserted eleven affirmative defenses, and filed a cross complaint against Plaintiff seeking declaratory relief and recovery and reimbursement for unjust enrichment. Doc. 8. On May 5, 2014, Plaintiff filed its answer to Defendants' counterclaims, and asserted eleven affirmative defenses. Doc. 11.

On February 24, 2015, Defendants filed a motion for summary judgment arguing that there are no material facts at issue and that Defendants are entitled to judgment on the breach of contract and bad faith claims. Doc. 16. Defendants cite Dr. Lundeen's report attributing Book's injuries to two separate causes. *Id*. at 5. Defendants argue that occurrence is unambiguously defined in Plaintiff's insurance policy, which states:

> (g) "occupational disease" shall include: (1) death resulting therefrom and (2) cumulative injuries;
>
> (h) "occurrence", as applied to bodily injury shall mean accident. Occupational disease sustained by each employee shall be deemed to be one separate occurrence and the occurrence shall be deemed to take place on the date upon which the employee is last exposed at work to conditions allegedly causing such occupational disease.

6

Policy at 15. Defendants argue that according to Dr. Lundeen's 60/40 apportionment, neither incident meets the $300,000 minimum retention. Defendants rely on *Supervalu v. Wexford Underwriting Managers* Inc., 175 Cal. App. 4th 64, 73-74(2009), to argue that the language of the insurance policy is not ambiguous as to the terms of the contract. The policy in *Supervalu* defined occupational disease and occurrence in the same manner as those terms are defined in the . Defendants further rely on *Supervalu* to argue "coverage for losses under a Workers Compensation policy is determined by the policy language, not by the language of an underlying award or settlement." Doc. 16 at 14. Defendants assert that because Plaintiff is not entitled to coverage, they are not liable for bad faith. *Id*. at 15. Defendants argue, "[b]ecause [Plaintiff] has not satisfied its Specific Retention for either of the two occurrences that resulted in its losses, [Defendants] cannot have breached [their] duty to indemnify [Plaintiff] under the terms of the excess policy. Consequently, [Defendants] ha[ve] not breached the policy and cannot be liable for bad faith." *Id*. Defendants argue in the alternative that even if it had a duty to indemnify that bad faith could not flow from mistakenly withholding policy benefits. *Id*.

Plaintiff opposes Defendants' motion for summary judgment. Plaintiff argues that it is not for the Court to determine whether or not Book's injury is attributable to two occurrences, as the Workers' Compensation Judge has already awarded damages. Doc 21 at 5. Plaintiff asserts that Defendants are estopped from alleging two occurrences because they agreed to the settlement of Book's cases without sending a reservation of rights letter. Plaintiffs argue that Defendants acted in bad faith by failing to previously assert that Book's injury stemmed from two occurrences, *id.* at 5, and that that Defendants' obligation to investigate was triggered once the $300,000 threshold of the Excess Insurance coverage was reached, which would have been prior to any payment being made. *Id*. at 9. Finally, Plaintiff argues, if the Court were to determine the cause of the injury it would require a factual determination and therefore it would be inappropriate for summary judgment. Doc. 21 at 5. Plaintiff maintains that the existence of multiple medical reports creates a triable issue of fact as to the cause of Book's injury,

7

because at least one of the medical reports attributes all of Book's injuries to cumulative trauma. *Id*. at 11. Finally, Plaintiff argues that the policy language is ambiguous. *Id*.

Defendants filed their reply on March 19, 2015, arguing that as an excess insurance provider they were not required to reserve their rights until primary coverage was exhausted. Doc. 28 at 3-4. Defendants further argue that they did not intend for the approval of the settlement to determine the cause of Book's injuries. In the alternative, Defendants assert that if the issue was previously decided, Dr, Lundeen's report attributing Book's injury to two causes should be controlling, as the workers' compensation decision relied on the report. *Id*. at 5-6.

### IV. **MOTION FOR SUMMARY JUDGMENT**

Summary judgment is proper if the movant shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).

If the moving party would bear the burden of proof on an issue at trial, that party must "affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). In contrast, if the non-moving party bears the burden of proof on an issue, the moving party can prevail by "merely pointing out that there is an absence of evidence" to support the non-moving party's case. *Id*. When the moving party meets its burden, the non-moving party must demonstrate that there are genuine disputes as to material facts by either:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or

8

presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

In *Celotex Corp.*, the Supreme Court held

> The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which the party will bear the burden of proof at trial. In such a situation, there can be no genuine issues as to any material fact, since a complete failure of proffer concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.

*Id*. at 322 (internal citations and quotations omitted). Parties who present mere allegations and claims that they will discredit the moving party's evidence at trial fail to meet the burden placed upon them. *T.W. Elec. Serv., Inc., v. Pac. Elec. Contractors Ass'n,* 809 F. 2d 626, 630 (9th Cir. 1987). "The non-moving party must do more than show there is some metaphysical doubt as to the material facts at issue." *In re Oracle Corp. Sec. Litig*., 627 F.3d 376, 387 (9th Cir. 2010) (internal citations and quotations omitted). In such cases, "the moving party is entitled to a judgment as a matter of law because the nonmoving party has failed to make a sufficient showing on an essential element of [their] case with respect to which [they have] the burden of proof." *Celotex Corp*, 477 U.S. at 323.

### V. ANALYSIS

**1. Defendants Are Only Required to Indemnify Plaintiff if a Single Occurrence Created a Claim Greater than $300,000**

The threshold question in this case requires the Court to determine whether Defendants were required to indemnify Plaintiff against losses above $300,000 stemming from Book's injury. Plaintiff's insurance policy clearly states, "no indemnity shall be afforded under this Policy, unless and until the Insured shall have sustained loss and claim expense as resulted of **each occurrence** in excess of the amount of the retention stated." Doc. 1-1 at 2. (emphasis added) Although insurance contracts maintain "special features, they are still contracts, to which the ordinary rules of contractual interpretation apply." *Conestoga Services Corp. v. Executive Risk Indemnity, Inc*. 312 F. 3d 976, 982 (9th Cir. 2002). In

9

California, "when interpreting insurance policies, a court must look to the common understanding of the language with an eye to reasonableness and context." *California Dairies Inc. v. RSUI Indem. Co.*, 617 F. Supp. 2d 1023, 1031 (E.D. Cal. 2009). "Subject to the other rules of interpretation, the language of a contract governs its interpretation if the language is clear and explicit and does not involve an absurdity." *Supervalu*, 175 Cal. App. 4th at 72. *Supervalu* addressed the reasonableness of the definition of occurrence. *Id*. at 74. As in the case at bar, occurrence was defined to involve either an accident or cumulative injuries. *Id*. The court in *Supervalu* determined "the contractual language is not ambiguous." This Court agrees with *Supervalu* that the terms of the insurance contract are not ambiguous. Thus the remainder of this analysis focuses not on the meaning of the terms of the contract but on how they are factually applied.

Plaintiff asserted that as of December 16, 2011, they had paid $319,275.07 or $19,275.97 above the $300,000 threshold. Doc. 1-4 at 2.[2] Plaintiff previously provided Defendants with historical medical records but made no efforts to highlight that Book's injury may have been the result of more than one occurrence, as defined in the insurance policy. If Book's injuries stem from a single occurrence, then Defendants are required to indemnify Plaintiff for all costs above $300,000. If, however, Book's injury stems from more than one occurrence, Plaintiff's payments to Book must be apportioned out by the percentage that each occurrence contributed to the injury and submitted as separate occurrences to Defendants. For example, if Dr. Lundeen's view is accepted, as Defendants argue it should be, then one claim would consist of 60% of $319,275.07, $191,565.04, and the other claim would be for 40% of the total payment, $127,719.03. Doc. 1-5 at 3. Apportioned as such, neither claim meets the $300,000 threshold; therefore, Defendants would not be liable to Plaintiff. A different apportionment between the two causes, however, might yield different results. Although Dr. Lundeen is the only doctor to provide an apportionment, the Court believes that several of the other doctors' assessments call Dr. Lundeen's

---

[2] There is evidence to suggest that since the claim was filed, Plaintiff paid additional monies to Book. The letter from Jennifer Nicholson suggested that the claim may rise as high as $440,000. Doc. 1-5 at 3.

apportionment into question. Specifically, the Court notes Dr. Clague's pre-operative report, which reports that Book's examination immediately after the December 1999 incident found "no specific shoulder tenderness. There was full range of motion of [Book's] neck and his neurovascular muscle was intact…It was felt he had cumulative trauma and a muscle strain." Doc. 23-2.  A determination that the December 1999 incident led only to muscle strain calls into question the fact that the incident was responsible for 60% of Book's injury. Thus Defendants' liability is dependent upon a determination of whether Book's injury was caused by one occurrence or two, as defined by the insurance policy. Alternatively, even if the finder of fact ultimately determines the injury stemmed from two occurrences, the percentage that each occurrence contributed to the injury presents a separate question of fact.

To show that more than a "metaphysical doubt as to the material facts at issue," *In re Oracle Corp. Sec. Litig.*, 627 F.3d at 387, Plaintiff provided the Court with hundreds of pages of Book's medical records, which were previously provided to Defendants, as part of the initial claim documenting Book's various diagnosis.[3] After reviewing the several hundred pages of medical reports, this Court finds that the doctors provide factually different opinions regarding the cause of Book's injury. Defendants cite Dr. Fujihara's report, which concluded that Book's injury "was caused by a cumulative trauma disorder with acute <u>exacerbation</u> at work." Doc. 28 at 9 (emphasis added). Defendants do not present a definitive definition of "exacerbation" but <u>their own claims adjuster</u>, Jennifer Nicholson, testified that while "doctors tend to use exacerbation and aggravation interchangeably ... legally exacerbation is -- is like a temporary state, its not considered a new injury in California." *Deposition of Jennifer D. Nicholson*, Doc. 23-1.

Dr. Clague reported that Book had "cervical stenosis secondary to degenerative changes, probably on the basis of cumulative trauma which clearly triggered through an increase in symptoms with his lifting episode." *Id*. In other portion of Dr. Clague's report, however, he notes that Book reported pain

---

[3] The Court notes that these documents were not presented in an organized fashion and the burden of determining their value and meaning was placed on the Court when it should have been Plaintiff's responsibility.

and weakness in his right arm and shoulder even before the December 1999 incident. Doc. 23-2 at 96.

Other doctors' reports provide similarly varied opinions. For example, Dr. Watson reported Book's "problem goes back to December 1999 when he had an on the job injury which resulted in right arm weakness and pain in the shoulder and arm." Doc. 23-2 at 25. This does not provide this Court with a clear factual answer as to Dr. Watson understanding of how the injury occurred, but suggests that it might be based on the December 1999 incident alone. Doc. 23-2 at 25. .

The Court finds that the issue is close and that jury could possibly find that Book's injuries stemmed from cumulative trauma alone, from December 1999 lifting incident alone, or from a combination of cumulative trauma and the December 1999 lifting episode, creating a genuine issue of fact as to the cause of Book's injuries. While the Court acknowledges that the doctors' diagnoses appear similar, it finds that there is more than a scintilla of evidence differentiating them, allowing for a trier of facts to find for the non-moving party on the issue of the number of occurrences.

In addition, the record reflects differences in the causal apportionment between the varying reports. While Dr. Lundeens' 60/40 causal apportionment is the most clearly articulated, there is record evidence to support an alternative apportionment finding. Dr. Fujihara's and Dr. Clague's reports place much greater emphasis on cumulative trauma, almost to the exclusion of the December 1999 incident. As discussed above, while Dr. Lundeen's apportionment of cause would absolve Defendant of liability if the finder of fact also determined there were two occurrences because neither claim would rise to meet the necessary threshold, a different division of the causal blame might allow one of the claims to meet the minimum $300,000.[4]

**2.    Judicial Estoppel**

In the alternative, Defendants argue that Dr. Lundeen's report judicially estops Plaintiff from claiming that Book's injury was not caused 60 percent by specific injury and 40 percent to a cumulative

---

[4] It is notable that only Dr. Lundeen prepared a report specifically for use in a judicial proceeding and that neither party has provided the Court with an expert opinion regarding the similarity or differences among the varying doctors' reports.

injury. Doc. 28 at 7. Thus, according to Defendants, even if not all the doctors agree, Plaintiff's reliance on Dr. Lundeen's report in previous proceedings precludes a different finding on either key material factual issue. Defendants state "Plaintiff was not 'ignorant of the true state of facts since it had every document it asserts Continental had in its files… Plaintiff relied on and proffered Dr. Lundeen's report in support of their position in the Book claim." Doc. 28 at 7.

In response, Plaintiff claims that Defendants are estopped from now asserting that Book's injuries stem from two occurrences. Plaintiff states that Defendants should have raised the issue either when the claim was first submitted, before the settlement was approved, or at a minimum before Defendants paid the claim. Doc. 21 at 11-12. Plaintiff argues it relied on Defendants' acceptance of a single incident when they decided to settle Book's claim.

Judicial estoppel is an equitable doctrine that precludes a party from gaining an advantage by asserting one position, and then later seeking an advantage by taking a clearly inconsistent position. *Rissetto v. Plumbers & Steamfitters Local 343,* 94 F.3d 597, 600-601 (9th Cir.1996). Judicial estoppel not only prevents a party from gaining an advantage by taking inconsistent positions, but also provides for the orderly administration of justice and regard for the dignity of judicial proceedings. *Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 782 (9th Cir. 2001). The application of judicial estoppel is not limited to bar the assertion of inconsistent positions in the same litigation, but is also appropriate to bar parties from making incompatible statements in two different cases. *Id.*

"Federal law governs the application of judicial estoppel in federal courts." *Johnson v. Oregon,* 141 F.3d 1361, 1364 (9th Cir. 1998). The Supreme Court held that although there is no simple formula that can be applied to decide if judicial estoppel applies there are several factors are to be considered. *New Hampshire v. Maine,* 532 U.S. 742, 750 (2001).

> First, a party's later position must be clearly inconsistent with its earlier position…Second, courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled. Absent success in a prior proceeding, a party's later inconsistent position introduces no risk of inconsistent court determinations…and thus

> poses little threat to judicial integrity…A third consideration is whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.

*Id.* at 750-751. The Ninth Circuit held that a settlement with the Workmen's Compensation Appeals Board was akin to winning a judgement, and thus any statements made as part of a workers' compensation claim could be considered a statement in a successful preceding case for the purposes of judicial estoppel. *Rissetto*, 94 F.3d at 604-05. Therefore, the second judicial estoppel factor is arguably present here.

However, the first factor has not been established. The Ninth Circuit has rejected a per se rule regarding judicial estoppel. *Fredenburg v. Contra Costa Cnty. Dep't of Health Serv.,* 172 F.3d 1176, 1179 (9th Cir. 1999). In *Fredenburg*, the Court held, "although we acknowledged that estoppel might be appropriate when the inconsistency of statements and positions was so blatant as to demonstrate that a claimant is playing fast and loose with the courts, our clear preference was that inconsistent statements simply be considered along with other evidence to see whether they were so damaging that no rational trier of fact could rule in the [party's] favor." *Id.* (internal citations and quotations omitted). In the case at hand, neither party has met its burden of proving that the position the opposing party took as part of the workers' compensation claim was "clearly inconsistent" with the position they now assert. The question presented to the Workers' Compensation Appeals Board was whether Book was disabled to the point where he was unable to work. Indeed, the stipulations in the ruling refer to Dr. Lundeen and Dr. Zucherman's disability assessments, not the cause of Book's injuries. The Workers' Compensation Appeals Board appears not to have made any determinations regarding the cause of Book's injuries, and therefore a subsequent ruling on that issue would not create disharmony between the two decisions. *New Hampshire*, 532 U.S. at 750. Additionally, both parties appear to have relied on a variety of doctors' reports. Thus, favoring one theory over another does not rise to the level of "playing fast and loose with the [C]ourt" but rather a tactical strategy. *Fredenburg ,* 172 F.3d at 1179.

In *August v. Provident Life & Acc. Co*., 772 F. Supp. 2d 1197, 1205 (C.D. Cal. 2011), the Court found that a person was not judicially estoppped from claiming complete disability under workers' compensation while at the same time maintaining that he was fired in violation of the Americans with Disabilities Act. The Court reasoned, "Defendant's evidence is insufficient to satisfy its burden of showing that Plaintiff's position concerning his workers' compensation claim, in the situation here where his employer concluded he could not do his job, is tantamount to committing fraud on the court." *Id*. The court in *August* recognized that medical claims are complex, and often rely on a variety of factors. *Id*. This Court agrees and finds that neither party has presented sufficient evidence to show that the opposing party committed fraud on the Court. Therefore the Court rejects the judicial estoppel argument.

### 3. **Bad Faith Cause of Action**

Defendants argue that Plaintiff's bad faith claim fails as a matter of law. "The covenant of good faith and fair dealing has particular application to insurers because they are invested with a discretionary power affecting the rights of another." *Amadeo v. Principal Mut. Life Ins. Co.,* 290 F.3d 1152, 1161 (9th Cir. 2002) (internal quotations and citations omitted). "Under California law, 'insurance bad faith' refers to a breach of the implied covenant of good faith and fair dealing as that covenant applies to insurance policies. An insurer breaches this covenant when it acts unreasonably in discharging its obligations under the policy." *Gentry v. State Farm Mut. Auto. Ins. Co*., 726 F. Supp. 2d 1160, 1166 (E.D. Cal. 2010). California courts have determined, like all other issues, that when there are genuine factual disputes, bad faith claims cannot be decided in summary judgement proceedings.

> Where there is a factual dispute as to the sincerity and genuineness of the purported bases for denying coverage and the reasonableness of the insurers overall conduct in wrongly denying the claim an insurer's bad faith is ordinarily a question of fact to be determined by a jury considering the evidence of motive, intent and state of mind.

*Bernstein v. Travelers Ins. Co*., 447 F. Supp. 2d 1100,1113 (N.D. Cal. 2006).

A successful claim of bad faith requires benefits due under the policy to be withheld unreasonably. *Id*. "Even where benefits are ultimately found to be due, a withholding was reasonable,

and therefore not in bad faith, if the insurer conducted a thorough and fair investigation, after which there remained a genuine dispute as to coverage liability." *Id* (internal citations and quotations omitted). "To commit bad faith, an insurer must (1) act unreasonably toward the insured and (2) either know that it was acting unreasonably or demonstrate such reckless disregard to the reasonableness of its actions that knowledge of reasonableness may be imputed." *James River Ins. Co. v. Hebert Schenk, P.C.,* 523 F.3d 915, 923 (9th Cir. 2008). The first prong is objective and the Court must determine "whether the insurer acted in a manner consistent with the way a reasonable insurer would be expected to act." *Id*. .

A reasonable third party insurer must reserve its right to reimbursement if it wants to seek reimbursement. *Vierramoore, Inc. v. Contintental Casualty Co.*, 940, F. Supp. 2d 1270, 1284 (E.D.Cal 2013). "The prerequisites for seeking recoupment of funds extended to settle the Underlying Action include: (1) timely and express reservation of rights and (2) an express notification of the insureds of insurer's intent to accept a proposed settlement order." *Id*. *See*, *Ramirez v. USAA Casualty Ins. Co*., 234 Cal. App. 3d 391, 399 (1991) ("One important facet of the insurer's obligation to give thee insured's interest as much consideration…as it does its own is the duty reasonably to inform an insured of the insured's rights and obligations under the insurance policy.").[5]

The second element of bad faith is subjective and requires the Court to determine whether the insurer consciously acted unreasonable. *James River Ins. Co. v. Hebert Schenk, P.C.*, 523 F.3d 915, 923 (9th Cir. 2008) "The insurer may commit bad faith not only by intentionally and unreasonably denying a claim, but also by intentionally processing, evaluating, or paying a claim in an unreasonable manner." *Id.*

---

[5] "The reservation of rights requirement is important in the third party defense context because it puts the insured on notice that he has to protect his interests where they differ from the insurance company's interests. The insurer's control of his defense against the third party claim may run counter to how the insured would manage defense and settlement if he knew that the insurer might not pay the judgment or settlement." *Equitable Life Assur. Soc. of U.S. v. Schwartz*, 291 F. App'x 25, 27 (9th Cir. 2008).

In order for the Court to rule on a summary judgment in the context of bad faith, it must be "undisputed or indisputable that the basis for the insurer's denial of benefits was reasonable - for example, where even under the plaintiff's version of the facts there is a genuine issue as to the insurer's liability under California law." *Safeco Ins. Co. of Am. v. Guyton,* 692 F.2d 551, 557 (9th Cir.1982).

In the case at bar, there are several disputed issues of material fact. As discussed above, there is a factual question of whether Plaintiff was due a benefit. Further factual questions arise as to whether Defendants acted reasonably and in good faith in requesting reimbursements without previously, and reasonably timely providing a reservation of rights, as it is unclear to this Court when the reservation of rights was sent prior to payment. As several questions of fact remain, the bad faith claim is not an issue law as Defendants argue but a question of fact, which this Court cannot decide on a motion for summary judgment.

## VI. CONCLUSION AND ORDER

For the reasons set forth above, Defendants' Motion for Summary Judgment, Doc. 19, is DENIED.

IT IS SO ORDERED.

Dated:   **May 13, 2015**              /s/ Lawrence J. O'Neill
                                       UNITED STATES DISTRICT JUDGE